RECEIPT # 53940
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NITIN SUBANDH, Individually and On Behalf of
All Others Similarly Situated,

        Plaintiff,

    vs.

NETWORK ENGINES INC., JOHN CURTIS,
DOUGLAS G. BRYANT and LAWRENCE A.
GENOVESI,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO. _____

# 04-10332JLT

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

MAGISTRATE JUDGE _____

Plaintiff has alleged the following based upon the investigation of plaintiff's

counsel, which included a review of United States Securities and Exchange Commission ("SEC")

filings by Network Engines, Inc. ("Network Engines" or the "Company"), as well as regulatory

filings and reports, securities analysts' reports and advisories about the Company, press releases

and other public statements issued by the Company, and media reports about the Company, and

plaintiff believes that substantial additional evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal class action on behalf of purchasers of the securities of Network

Engines between November 6, 2003 and December 10, 2003, inclusive (the "Class Period"),

seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

5.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Nitin Subandh, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Network Engines at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Network Engines is a Delaware corporation with its principal place of business located at 25 Dan Road, Canton, MA 02021.  The Company is a provider of server appliance hardware and custom integration services.  Network Engines is focused on partnering with independent software vendors (ISVs) and original equipment manufacturers (OEMs) to provide these strategic partners with server appliance hardware, integration services and

2

appliance development, deployment and support to allow these strategic partners to deliver turnkey solutions to their end user customers.

8.      (a)    Defendant John Curtis ("Curtis"), was, at all relevant times, Network Engines's President and Chief Executive Officer.

(b)    Defendant Douglas G. Bryant ("Bryant") was, at all relevant times, Network Engines's Chief Financial Officer ("CFO") and Vice President, Finance and Administration.

(c)    Defendant Lawrence A. Genovesi ("Genovesi") was, at all relevant times, a founder of Network Engines and the Chairman of its Board of Directors.  He also previously served as the Company's President, Chief Executive Officer and Chief Technology Officer.

(d)    Defendants Curtis, Bryant and Genovesi are collectively referred to herein as the "Individual Defendants."

9.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects <u>via</u> access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the

3

collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Network Engines, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications

4

complained of herein and were aware of, or recklessly disregarded, the misstatements contained

therein and omissions therefrom, and were aware of their materially false and misleading nature.

 Because of their Board membership and/or executive and managerial positions with Network

Engines, each of the Individual Defendants had access to the adverse undisclosed information

about Network Engines's business prospects and financial condition and performance as

particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the

positive representations made by or about Network Engines and its business issued or adopted by

the Company materially false and misleading.

13.     The Individual Defendants, because of their positions of control and authority as

officers and/or directors of the Company, were able to and did control the content of the various

SEC filings, press releases and other public statements pertaining to the Company during the

Class Period. Each Individual Defendant was provided with copies of the documents alleged

herein to be misleading prior to or shortly after their issuance and/or had the ability and/or

opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the

Individual Defendants is responsible for the accuracy of the public reports and releases detailed

herein and is therefore primarily liable for the representations contained therein.

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course

of business that operated as a fraud or deceit on purchasers of Network Engines securities by

disseminating materially false and misleading statements and/or concealing material adverse

facts. The scheme:  (i) deceived the investing public regarding Network Engines's business,

operations, management and the intrinsic value of Network Engines securities; (ii) enabled

defendant Genovesi to sell 75,000 shares of his personally-held stock at artificially inflated prices

for gross proceeds of $783,300. and (iii) caused plaintiff and other members of the Class to purchase Network Engines securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Network Engines between November 6, 2003 and December 10, 2003, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is imprac-ticable. Throughout the Class Period, Network Engines common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Network Engines or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

6

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Network Engines; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21.     Network Engines is a provider of server appliance hardware and custom integration services. The Company is focused on partnering with independent software vendors (ISVs) and original equipment manufacturers (OEMs) to provide these strategic partners with

7

server appliance hardware, integration services and appliance development, deployment and support to allow these strategic partners to deliver turnkey solutions to their end user customers.

22.    Network Engines became a public company in mid-2000 and, shortly thereafter, suffered a decline in a substantial portion of its business with the bursting of the internet bubble. In late 2001, Network Engines entered into a successful manufacturing deal with EMC Corporation ("EMC") to build its Centera product, a contract that would soon account for half of the Company's revenue. Centera was designed for storing fixed content, such as medical records and e-mail messages, and was introduced just as health care and securities regulations began to increase, igniting strong demand for such a data storage platform.

23.    Then, in November 2002, Network Engines acquired TidalWire, Inc. ("TidalWire"), which enabled it to expand into the distribution business. TidalWire is a specialist in the distribution and support for storage networking and has had significant traction distributing Host Bus Adapters (HBAs). HBAs are cards that connect data storage systems to computer networks. With the acquisition of TidalWire, Network Engines was able to expand the scope of its relationship with EMC by distributing HBAs to EMC.

24.    By the beginning of the Class Period, defendants knew, but failed to disclose, that Network Engines was in the process of renegotiating its distribution contract with EMC, and that EMC was demanding price reductions, which, if agreed to, would negatively impact the Company's future financial results. Nevertheless, throughout the Class Period, defendants issued positive statements highlighting the Company's strong financial performance, continued growth and the success of its relationship with EMC, its largest customer.[1] Defendants failed to disclose,

---

[1]    Because of the Company's policy regarding identifying certain of its customers,

8

however: (i) that the Company was in the process of renegotiating its distribution contract with EMC; (ii) that EMC was demanding price concessions to bring its agreement with Network Engines in line with the pricing that Network Engines was providing to other customers; (iii) that the new distribution contract with EMC would negatively impact the Company's future financial performance; (iv) that the Company would not be able to sustain the growth in its gross margins as a result of the amended contract; and (v) as a result, the Company's positive statements issued during the Class Period were materially false and misleading when made.

25.     Finally, on December 10, 2003, the Company announced, among other things, that it had renegotiated its distribution contract with EMC and the amended contract would negatively impact the Company's gross profit related to the sale of EMC-approved HBAs and the Company's distribution operations gross profit.

26.     Following this announcement, shares of Network Engines common stock fell $3.92 per share, or 39%, to close at $6.10 per share, on extraordinarily high trading volume, and have continued to decline since that time.

## Materially False and Misleading
## Statements Made During the Class Period

27.     The Class Period begins on November 6, 2003. On that date, the Company issued a press release announcing its financial results for the fourth quarter and full year of fiscal 2003. Defendant Curtis commented on the Company's "solid" performance, stating, in pertinent part, as follows:

---

the Company does not refer to EMC directly by name, but rather as its "largest" customer.

9

> The results for our fiscal year 2003 reflect a dramatic turnaround for Network
> Engines. Our results reflect the continuing success of our business strategy. We
> are seeing increasing acceptance of our unique value proposition by our customers
> and software partners. We recently announced new application partners, including
> KVS, Inc., Computer Associates International, Inc. and CommVault Systems,
> Inc., that we will work with to develop and distribute server appliances into our
> customer base of over 400 channel customers in the growing storage and security
> networking markets. [Emphasis added.]

The press release also commented on the Company's relationship with its current customer base, stating, in part, as follows:

> Additionally, the Company continued to develop its relationships with new
> partners and strengthen relationships with existing partners. [Emphasis added.]

28.     In a conference call with investors later that same day, defendants Curtis and Bryant discussed the Company's performance and, towards the end of the call, responded to a series of questions by the participants on the call. Defendant Curtis began the call and spoke positively about the Company's positioning for future growth and the success of the Company's acquisition of TidalWire. Specifically, defendant Curtis stated, in pertinent part, as follows:

> As we have said previously, we believe that there is a trend towards the
> convergence of storage and security applications and we believe that we have
> positioned the company to address the growing demand for network appliance
> solutions in these markets.
>
> We consider our acquisition of TidalWire to be a core success for our company. In
> our Q4, we benefited from the surge in demand for storage networking products
> distributed by our TidalWire distribution operation. [Emphasis added.]

Defendant Curtis continued to comment positively on the future opportunities for the Company, stating, in pertinent part, as follows:

> Furthermore, <u>we are optimistic that in coming quarters, there will be more opportunities to partner with existing and the newly signed software companies to develop, market and distribute new appliances into the storage and security markets.</u> [Emphasis added.]

Defendant Curtis further commented on the success of TidalWire, stating, in pertinent part, as follows:

> We have added a highly qualified distribution sales, marketing and logistics team from TidalWire, along with their state-of-the-art CRM and logistic systems and equally important, a channel of over value-added resalers, resellers and systems integrators.

Additionally, defendant Bryant made positive statements about the Company's performance and its future outlook.  Concerning the Company's gross margins, defendant Bryant stated that

> Gross margins for the fiscal year were 20.6% compared to 14.2% in fiscal 2002. During fiscal 2003, <u>the distribution business contributed 19.8% gross margin,</u> while the OEM appliance business contributed 21.3% gross margins.

> The entire 14.2% gross margins from fiscal 2002 were generated exclusively by our OEM appliance business as we had not yet acquired TidalWire, which occurred at the end of the first fiscal quarter of 2003. [Emphasis added.]

With regard to the dramatic decrease in the Company's net loss, defendant Bryant stated:

> <u>This improvement is directly related to the growth of our revenues which was driven by our acquisition of TidalWire</u> and the growth in our OEM appliance business, while maintaining control over our operating expenses. [Emphasis added.]

Defendant Bryant also responded to certain questions at the end of the call.  For example, defendant Bryant was asked if the Company was experiencing pressure from its largest OEM

11

client, EMC, to offer more aggressive prices on its products. The question and answer went as follows:

> OMAR ALMADANNI (ph), ANALYST, SOUNDVIEW: Yes, good morning. Just a question on your largest OEM customer here, from my rough estimate, it looks like it dropped about 7% sequentially in terms of revenues, but you know, that customer had mentioned qualitatively that they saw pretty strong sequential growth in that specific product line.
>
> So I guess the question here is you know, what is the delta coming from, is the, is this customers diversifying to another manufacture, are they pricing more aggressively with you, or you know, how much of that is due to the perhaps consignment issue?
>
> DOUG BRYANT: Omar (ph) , I think, this is Doug. <u>I think we've stated in the past that, you know, it's really difficult to correlate, you know, what we report versus what our partner reports, and you know, all we can tell you that, you know, we ship it when they ask for it</u>. And it's just really tough to do any kind of correlation, you know, the fact that we talked about we changed the way, you know, going from that, going to that consignment inventory situation, you know, that certainly had an impact on it, <u>but other than that, you know, we, you have to talk to our partner about any other questions</u>.
>
> OMAR ALMADANNI (ph): I mean, would you be able to comment on whether that specific partner is diversifying?
>
> DOUG BRYANT: We can't speak for them.
>
> OMAR ALMADANNI (ph): You can't, OK.
>
> DOUG BRYANT: You should talk to them about that.  [Emphasis added.]

29.    The statements referenced above in ¶¶ 27 and 28 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others: (i) that the Company was in the process of renegotiating its distribution contract with EMC; (ii) that EMC was demanding price concessions to bring its agreement with Network Engines in line with the pricing that Network Engines was providing to

other customers; (iii) that the new distribution contract with EMC would negatively impact the Company's future financial performance; (iv) that the Company would not be able to sustain the growth in its gross margins as a result of the amended contract; and (v) as a result, the Company's positive statements issued during the Class Period were materially false and misleading when made.

30.     The Class Period ends on December 10, 2003. That morning, the Company issued a press release announcing that its distribution agreement with EMC Corporation had been amended, and that all changes would be effective January 1, 2004. Under the terms of the agreement, Network Engines will experience increased costs relating to the sale of EMC-approved HBAs. The Company further stated that this amendment will result in a decline in the gross profit related to the sale of EMC-approved HBAs and also negatively impact the Company's distribution operations gross profit. Defendant Bryant also disclosed that the amendment will now make gross profit on the sale of EMC-approved HBAs "more in line with our gross profit on the distribution of other third party storage networking products, which has ranged from 7% to 12% of net revenues." Finally, the Company stated that it was considering whether this amendment may have impaired the goodwill and intangible assets associated with the acquisition of TidalWire.

31.     Following this report, shares of Network Engines fell $3.92 per share, or 39%, to close at $6.10 per share, on volume of more than 14.396 million shares traded, or almost fourteen times the average daily volume. By December 15, 2003, the stock had fallen an additional 26.8% to close at $4.46 per share.

13

32.     The market for Network Engines's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Network Engines's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Network Engines securities relying upon the integrity of the market price of Network Engines' securities and market information relating to Network Engines, and have been damaged thereby.

33.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Network Engines' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

34.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Network Engines' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Network Engines and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in

14

plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

35.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Network Engines, their control over, and/or receipt and/or modification of Network Engines' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Network Engines, participated in the fraudulent scheme alleged herein.

36.    Defendants were further motivated to conceal the truth about the Company and its operations in order to allow defendant Genovesi to sell 75,000 shares of his personally-held stock at artificially inflated prices for gross proceeds of $783,300.

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

37.    At all relevant times, the market for Network Engines' securities was an efficient market for the following reasons, among others:

15

(a) Network Engines' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Network Engines filed periodic public reports with the SEC and the NASDAQ;

(c) Network Engines regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Network Engines was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

38.    As a result of the foregoing, the market for Network Engines' securities promptly digested current information regarding Network Engines from all publicly available sources and reflected such information in Network Engines' stock price. Under these circumstances, all purchasers of Network Engines' securities during the Class Period suffered similar injury through their purchase of Network Engines' securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

16

39.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Network Engines who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

40.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enable defendant Genovesi to sell 75,000 shares of his personally-held stock at artificially inflated prices for gross proceeds of $783,300; and (iii) cause plaintiff and other members of the Class to purchase

17

Network Engines' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

42.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Network Engines' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

43.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Network Engines as specified herein.

44.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Network Engines' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Network Engines and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

18

course of business which operated as a fraud and deceit upon the purchasers of Network Engines securities during the Class Period.

45.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

46.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Network Engines' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have

19

actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

47.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Network Engines' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Network Engines' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Network Engines securities during the Class Period at artificially high prices and were damaged thereby.

48.   At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Network Engines was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Network Engines securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

49.   By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

50.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

51.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.    The Individual Defendants acted as controlling persons of Network Engines within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

21

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

54.     As set forth above, Network Engines and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 18, 2004

22

Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
**SHAPIRO, HABER & URMY**
75 State Street
Boston MA 02109
(617) 439-3939

SQUITIERI & FEARON, LLP
Stephen J. Fearon, Jr.
420 Fifth Avenue
18th Floor
New York, New York 10018
(212) 575-2092

**Attorneys for Plaintiff**

23